**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| DAMIEN POWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:11-CV-277-PPS-PRC |
| | ) | |
| JOHN BUNCICH, in his official capacity as | ) | |
| Sheriff of Lake County, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Damien Powell, a wheelchair-bound inmate in the Lake County Jail, filed a

claim under Title II of the Americans with Disabilities Act [DE 1] against defendant John

Buncich, in his official capacity as the Lake County Sheriff, alleging in part that the jail's shower

is not wheelchair accessible [*Id.*, ¶ 13].  Powell also filed an amended motion for an emergency

preliminary injunction, asking the Court to order Buncich to transport him to a hospital where he

can be evaluated for a head injury he sustained when he fell in the jail's shower [DE 12].

Buncich responded [DE 14], and the Court held an evidentiary hearing on the issue of whether

Powell's injury warrants the hospital evaluation he's seeking [DE 18].  For the following

reasons, and the reasons given from the bench at the close of the evidentiary hearing, Powell's

motion for emergency injunctive relief is **DENIED**.

## BACKGROUND

Powell has been incarcerated as a pretrial detainee at the Lake County Jail ("LCJ") since

April 15, 2011, when he was arrested on felony charges of robbery and other offenses, and based

on a warrant for an alleged violation of his parole conditions [DE 14 at 1; DE 14-2].  Powell's

lawsuit arises from a head injury he suffered on June 25, 2011, when he was using the LCJ's

shower facilities. On that date, LCJ officers arrived to retrieve Powell from the shower, and discovered him lying on his back, with his eyes closed and breathing heavily [DE 13-2 at 1]. The officers notified the floor supervisor, who called R.N. Lisa Rice, a member of the LCJ's medical staff [*Id.*]. Powell explained to Rice that he had fallen and hit his head on the shower wall [*Id.*].

Powell complained to Rice that he had a headache, and he asked to be taken to the hospital. But Rice found no bumps or bruises, and further found that Powell had normal vital signs, good memory, and that he appeared to be alert, in no distress, and oriented, despite that Powell was asking for his car keys [DE 19, Ex. D at 41]. Rice communicated her assessment of Powell's condition to her supervisor, Dr. Johann Farley [*Id.*; DE 13-2 at 1], who has been the LCJ's medical director since mid-April of 2011. Dr. Farley did not physically examine Powell on the date of the incident. But, based on Rice's report, he determined that there was no reason to have Powell transported to a hospital for further evaluation [DE 13-2]. Dr. Farley did, however, prescribe Tylenol for Powell's headache [DE 19, Ex. D at 41]. Buncich contends, and Dr. Farley testified, that the evaluation Powell seeks remains unnecessary [DE 14].

As noted, Powell seeks an order requiring the LCJ to transport him to a hospital for further evaluation [DE 13], and, in particular, he argues that he should be given a CT scan to test for the possibility that his fall caused a subdural hematoma. Powell's preliminary injunction papers include an unsworn letter from Dr. Chiedu Nchekwube, who, based on a review of unspecified materials, opines that Powell "deserved a brain Computerized Tomographic Scan to rule out slow subdural or [i]ntra-cerebral bleeding" [DE 13-5].

Dr. Nchekwube did not testify at the hearing, however. And curiously enough, neither

did Powell.  Indeed, the only witness presented at the hearing was Dr. Farley, who was called first by Powell as an adverse witness, and later by Buncich.

Dr. Farley testified that he and the LCJ's medical staff have placed Powell under constant supervision since the date of Powell's fall.  Dr. Farley explained that, because Powell's recollection after his fall was vivid, there was no need to order further diagnostic tests, such as the CT scan that Powell requests, which he said involves radiation and is thus potentially harmful.  Dr. Farley added that Powell's request for his car keys did not demonstrate a need for a CT scan or other medical imaging because Powell's memory of events occurring before the fall was intact, and memory deficit is a required symptom exhibited by anyone suffering from a subdural hematoma.

Thus, rather than ordering a CT scan, Dr. Farley ordered his nursing staff – including Nurse Rice and Sue Gunia – to continue administering Tylenol for Powell's headaches, and to monitor his symptoms on an hourly basis, including by talking with him and looking for abnormal behavior or other red flags.  Additionally, Dr. Farley personally sees and speaks with Powell when he makes his daily rounds.  Dr. Farley testified that he and his medical staff have been monitoring Powell on this schedule since Powell's June 25 fall, and have found no neurological abnormalities that would warrant the hospital evaluation that Powell seeks.

As Dr. Farley explained, Powell's medical records further indicate that Sue Gunia performed a follow up examination on the day of Powell's fall, reporting that Powell was "alert and oriented" and that she saw "no bruises or swelling" from the fall [DE 19, Ex. D at 42].

As noted, the only witness (and the only evidence) presented by Powell's attorney at the hearing was through his examination of Dr. Farley.  During this examination, Powell's counsel

asked Dr. Farley whether a CT scan was needed to determine whether Powell had developed a subdural hematoma. Dr. Farley responded that this was not medically necessary. Dr. Farley further explained that a CT scan is indeed used to diagnose such a condition. But he emphasized that Powell never exhibited any symptoms of a subdural hematoma, or any other condition warranting a CT scan, notwithstanding Powell's complaint of "seeing stars and bars" following his fall, which Dr. Farley noted was not a clinical manifestation of a subdural hematoma.

Dr. Farley further testified that the Tylenol administered to Powell would not alleviate a headache for someone suffering from a subdural hematoma. Yet, Powell had reported to the LCJ medical staff that his headache went away after taking the Tylenol [DE 19, Ex. D at 6]. Moreover, Dr. Farley opined that the primary cause of Powell's headaches is due to his high blood pressure. And he noted that Powell's medical records indicate that Powell complained of headaches before his June 25 fall, including on May 18, 2011 [DE 19, Ex. D at 51], May 19, 2011 [*Id*. at 49], and on April 19, 2011 [*Id*. at 60] – a headache that Powell himself attributed to high blood pressure [*Id*.].

Powell's counsel drew Dr. Farley's attention to a June 26, 2011 entry in Powell's medical records indicating that Powell's grip strength was noticeably weaker that day, the day after his fall [DE 19, Ex. D at 40]. Dr. Farley agreed that the symptoms of a subdural hematoma include weakness. But he added that this, alone, did not warrant subjecting Powell to a CT scan. First, weakness is only one of the required symptoms of a subdural hematoma, and Powell did not exhibit other required symptoms, such as dizziness and fatigue. Moreover, Dr. Farley pointed out that Powell is a paraplegic with transient quadriplegic symptoms, which include the weaker grip strength noted in Powell's June 26, 2011 medical records. Dr. Farley concluded that the

weaker grip strength noted in that entry is a result of Powell's quadriplegic tendencies rather than an indication that Powell is suffering from a subdural hematoma.

Dr. Farley further testified that, during Powell's incarceration, he has been housed either in the jail's fourth floor medical department, or in "H pod," a section of the jail that has a handicapped-accessible shower, including a wheelchair ramp, handrails and a seat located in the shower. The fourth floor medical department has a similarly equipped handicapped-accessible shower. Moreover, the LCJ's medical records reflect that Powell is aware that a shower chair is available for his use, and aware that he can seek assistance from a nurse should he require help transferring from his wheelchair to the shower chair [DE 19, Ex. D at 1]. Dr. Farley added that Powell has daily access to these showers, though, as the jail's shower logs reflect, he sometimes refuses the opportunity [DE 19, Ex. C at 6, 10 & 12-13].

As for Powell's request for transport to an outside hospital, Powell himself concedes that he has been transported to the emergency room of Methodist Southlake twice since his June 15, 2011 fall – on July 11 and 15 – complaining of a urinary tract infection [DE 13 at 4]. Powell did not advise the ER doctors there of his June 25 head injury on either of these occasions [*Id.*]. But, as Dr. Farley testified, the LCJ did not instruct Methodist Southlake to limit its examination of Powell to the urinary tract infection that prompted these hospital visits, and Powell was free to inform the doctors there of his head injury. Indeed, Dr. Farley opined that Powell could have told the ER doctors at Methodist Southlake about his head injury, and they would have examined him for it and made their own determination.

Furthermore, Dr. Farley testified that the medical records from Powell's two visits to Methodist Southlake indicate that neurological assessments were performed on Powell on both

occasions [DE 19, Ex. E at 3 & Ex. F at 3].  And he noted that the results of these neurological exams – including that Powell "is alert and oriented to person, place and time" [*Id.*] – do not indicate a need for a CT scan or other medical imaging, including for the purpose of ruling out the possibility of a subdural hematoma.  And the neurological exam performed during Powell's July 15 visit to Methodist Southlake further indicated that Powell exhibited no cranial nerve deficit [DE 19, Ex. F at 3], which Dr. Farley explained was an additional indication that Powell did not suffer from a subdural hematoma, or any other condition warranting medical imaging.

Dr. Farley further testified that, as of the date of the September 20, 2011 evidentiary hearing – more than 11 weeks after Powell's June 25 fall – he still did not believe there was any reason to transport Powell to a hospital for a CT scan or other medical imaging.

## DISCUSSION

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (quotation marks and citation omitted).  A party seeking a preliminary injunction must first demonstrate 1) a likelihood of success on the merits; 2) a lack of an adequate remedy at law; and 3) that he will suffer an irreparable harm if the injunction is not granted.  *Foodcomm Intern. v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003).  If any one of these threshold requirements is not met, I must deny the injunction.  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

I need only discuss the "likelihood of success" element of the preliminary injunction standard, since Powell's failure to meet this element is dispositive of his request for relief.  *AM*

*Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 830 (7th Cir. 2002) ("no likelihood of success on the merits is reason enough to deny the motion for preliminary injunction without further discussion"). To show that his Title II claim has a likelihood of success, Powell must demonstrate that his chance of success on the merits is "greater than negligible." *AM Gen. Corp.*, 311 F.3d at 804; *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). While this is an admittedly low requirement, Powell must provide some evidence supporting his claim and demonstrating to the Court that emergency relief is necessary. *See Foodcomm*, 328 F.3d at 303; *Srivastava v. Trs. of Indiana*, 2003 WL 1810507, at *2 (S.D. Ind. Mar. 21, 2003) (denying injunctive relief where "[p]laintiff has not supported her motion for preliminary injunction with any affidavits or other evidence.").

For Powell to succeed on his merits of his Title II claim, he must show: "(1) that he is a 'qualified individual with a disability,' (2) that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and (3) that the denial or discrimination was 'by reason of' his disability." *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (quoting 42 U.S.C. § 12132); *see also Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004); *Brettler v. Purdue Univ.*, 408 F. Supp. 2d 640, 662 (N.D. Ind. 2006).

I need only discuss the second element of the Title II claim – whether Powell was denied the benefits of the services, programs, or activities of a public entity – since Powell's failure to provide any evidence to support this element precludes him from satisfying the "likelihood of success" prong of the preliminary injunction standard. First, though, a word of clarification as to Powell's theory of Title II liability, which is not entirely clear from Powell's complaint and

preliminary injunction papers.

In his complaint, Powell alleges that the LCJ's "shower is neither wheelchair accessible nor is it equipped with grab bars or shower chairs" [DE 1, ¶ 13]. Based on the complaint alone, this allegation appears to be the basis of his theory of Title II liability. During the evidentiary hearing, however, Powell presented no evidence whatsoever that he was denied access to handicapped-accessible showers. On the other hand, Buncich presented undisputed evidence that Powell has daily access to a shower equipped with a wheelchair ramp, handrails and a seat. Accordingly, Powell provides me with no basis to conclude that he has a greater than negligible chance of succeeding on the merits of his Title II claim, if that claim is based on the contention that Powell was denied access to handicapped-accessible showers.

Of course, the main event during the evidentiary hearing was Powell's request for an order that he be transported to a hospital for an evaluation for his head injury. And for all I can determine on the basis of the record before me, Powell's theory of Title II liability may be that the LCJ's refusal to provide such an evaluation is itself a denial of benefits, in violation of Title II. I note, however, that Powell's contention that the LCJ wrongfully declined to authorize an outside evaluation sounds more like a claim, pursuant to Section 1983, that the LCJ failed to provide adequate medical care, *see Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007) (pretrial detainees have a right to adequate medical care under the Fourteenth Amendment), than a claim properly asserted under Title II. Yet, Powell has not alleged a Section 1983 claim, despite a reference to that section in his complaint [DE 1, ¶ 4].

Giving Powell the benefit of the doubt, I will suppose that he also bases his theory of Title II liability on the LCJ's refusal to authorize an evaluation of Powell's head injury by an

outside hospital. But, here again, Powell presented no evidence at the hearing from which I could conclude that he has a greater than negligible chance of succeeding on such a claim. As noted, the only evidence that Powell presented at the hearing was in the form of his adverse examination of Dr. Farley. And Dr. Farley's testimony on this subject was clear and unwavering: Powell does not exhibit any symptoms of a subdural hematoma or any other condition that would warrant the outside evaluation that Powell seeks.

Moreover, I found Dr. Farley to be a credible and reliable witness. And I found his explanation as to why he declined to order a CT scan or other medical imaging to be reasonable and persuasive, particularly given the risk of exposure to harmful radiation, which Dr. Farley explained was endemic to such procedures. Indeed, Powell's counsel's failure to present contrary evidence at the hearing – *e.g*., in the form of testimony from Powell himself or from Dr. Nchekwube – leads me to question whether Powell even *wants* the relief sought in the pending motion. After all, as Dr. Farley explained, Powell twice had the opportunity to request an evaluation of his head injury on his visits to Methodist Southlake, but he declined to do so.

In any event, Powell has failed to demonstrate a likelihood of success on the merits. Accordingly, I find no reason to order the Sheriff to expend scarce resources to test Powell for a brain injury where no evidence suggests such an injury exists.

## CONCLUSION

For the foregoing reasons, and the reasons given on the record during the evidentiary hearing, Powell's amended motion for emergency preliminary injunctive relief [DE 12] is **DENIED**.

**SO ORDERED**.

ENTERED:  October 11, 2011

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT